DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Patrick R. Martin, Jr. has appealed from a decision of the Summit County Court of Common Pleas that convicted him of felonious assault. This Court affirms.
 I {¶ 2} On June 18, 2002, the Summit County Grand Jury indicted Appellant on two counts of felonious assault, in violation of R.C.2903.11(A)(1). Appellant pleaded not guilty to the crimes as charged and the matter proceeded to a jury trial. The jury found Appellant guilty on one count of felonious assault and he was acquitted on the other count. Appellant was sentenced to six years imprisonment.
 {¶ 3} Appellant has timely appealed, asserting three assignments of error which we have consolidated to facilitate review.
 II Assignment of Error Number One
"The conviction of [appellant] for the charge of felonious assault in this case is against the manifest weight of the evidence and should be reversed."
 Assignment of Error Number Two
"The trial court incorrectly denied appellant's motion for acquittal in violation of [Crim.R. 29]; specifically, there was not sufficient evidence to prove the offense of felonious assault beyond a reasonable doubt."
 Assignment of Error Number Three
"The trial court errred to the prejudice of appellant and in violation of [Crim.R. 29], Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the Constitution of the United States, when it denied appellant's motion for acquittal."
 {¶ 4} In Appellant's first assignment of error, he has contended that his conviction was against the manifest weight of the evidence. He has further argued in his second and third assignments of error, that the trial court erred when it overruled his oral Crim.R. 29 motion because there was insufficient evidence to find him guilty of felonious assault. We disagree.
 {¶ 5} As an initial matter, this Court notes that the sufficiency and manifest weight of the evidence are legally distinct issues. State vManges, 9th Dist. No. 01CA007850, 2002-Ohio-3193, ¶ 23, citing Statev. Thompkins (1977), 78 Ohio St.3d 380, 386. Sufficiency tests whether the prosecution has met its burden of production at trial, whereas a manifest weight challenge questions whether the prosecution has met its burden of persuasion. Manges, supra, 2002-Ohio-3193, at ¶ 25. In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten
(1986), 33 Ohio App.3d 339, 340.
 {¶ 6} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant.Otten, 33 Ohio App.3d at 340.
 {¶ 7} In the instant matter, Appellant was convicted of felonious assault, a violation of R.C. 2903.11(A)(1). That section provides:
"(A) No person shall knowingly do either of the following:
"(1) Cause serious physical harm to another or to another's unborn [.]"
The term "serious physical harm" means:
"(b) Any physical harm that carries a substantial risk of death;
"(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
"(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious, disfigurement;
"(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)
 {¶ 8} Appellant has contended that he "had no intention of hurting anyone that evening." It appears that Appellant is attempting to argue that the state failed to prove that he "knowingly" caused the victim serious physical harm. The term "knowingly" connotes the culpable mental state of the accused. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). To determine whether Appellant acted "knowingly," his state of mind must be determined from the totality of circumstances surrounding the alleged crime. State v. Dorsey (Feb. 13, 1991), 9th Dist. No. 90CA004796, at 3.
 {¶ 9} In determining whether Appellant acted "knowingly" when he struck Patricia Bentz and Sheryl Manthe the jury was presented with two competing versions of events.
 {¶ 10} Patricia Bentz testified to the following at trial. On Saturday, June 8, 2002, Patricia had been drinking steadily throughout the day; she started drinking around nine or ten o'clock in the morning. At approximately 7:30 p.m. Appellant visited her apartment; Patricia stated that prior to Appellant's visit, she had approximately five beers. Appellant arrived at Patricia's apartment just as she was returning home from a visit with her mother and brother. Based on what she observed of Appellant, Patricia believed that he was intoxicated. She explained that he was "[s]luring and really drunk, could hardly stand up, really."
 {¶ 11} Patricia allowed Appellant into the apartment, and he took a seat on the couch next to Sheryl Manthe, Patricia's friend and temporary roommate. Patricia attempted to be cordial to Appellant by saying "hi real politely[,]" but Appellant responded with: "What the fuck happened to your face? Who beat you[r] ass?" Patricia explained that Appellant was reacting to the injuries she previously sustained when she fell down a flight of stairs. As a result of the fall, she "busted [her] nose and [the] whole side of [her] face was road rash."
 {¶ 12} After Appellant sat down, the three adults began to play "musical chairs." That is, Appellant kept "sitting too close" to the women and "telling [them] how he could take both of [them] on back in the backroom, stuff like that[,]" so the women moved from the couch to the chairs located in the kitchen. As the women were moving from the living room to the dining area, Appellant continued to make derogatory comments to them. He continuously referred to them as "cunts, bitches, whores, sluts, and fucking, lying bitches[,]" and the conversation between Appellant and the two women went from "being lewd and crude to sexually suggestive." Patricia responded to Appellant's comments by "[asking] [Appellant] over and over, politely, to leave, and he wouldn't leave. So then [she] couldn't take any more of the name calling, so [she] went and shut [herself] into the bathroom."
 {¶ 13} While in the bathroom, Patricia could hear "ruckus and thudding" coming from the living room. When she can out of the bathroom, she saw Sheryl lying curled up in a ball by the table located between the kitchen and the living room. Patricia saw:
"[Appellant] with a baseball bat whaling on [Sheryl] over and over. And before [Patricia] could shove him down, he had gotten seven to ten times about [Sheryl's] head mostly and her body.
"[Patricia] shoved [Appellant]. He landed in the kitchen on his face. And [she] turned around to see if [Sheryl] was okay, and that's when he whacked [Patricia]. And [she] threw a chair. Somehow [Sheryl] got a hold of to cover herself, and while — [Patricia didn't] know how [she] made it to the bedroom, because that was the only place there was a phone. [Patricia] remember[ed] dialing 330, thinking, [duh], and then [she] called 911. But [she didn't] remember what [she] said to the dispatcher because at that time [she] was bleeding very profusely. So [she didn't] really remember what [she] had said.
"And then [Patricia and Sheryl] were hiding. [Sheryl] made it back to the bedroom and [they] were hiding. And [they] peeked out [the bedroom door and] that's when the police were coming in the door."
 {¶ 14} When Appellant "smacked" Patricia with the bat he did it "[r]eal hard[,]" which caused her to bleed "really bad[.]" Appellant hit Sheryl "[l]ike he was out to kill." Patricia explained that the bat, with which Appellant used to beat her and Sheryl, belonged to her. "[The bat] was given to [her] because [she] was a single woman living in an apartment by [herself]." According to Patricia, the only time she "ever touched that bat was to hide it behind [the couch] and leave the handle out far enough for anybody who ever needed it they could grab it easily for protection." She never saw Sheryl handle the bat during the course of the attack.
 {¶ 15} After the police arrived, Patricia was taken to a hospital and her head wounds were stitched and bandaged.
 {¶ 16} On cross-examination, Patricia stated that she had known Appellant for approximately five years and, in that that time, they were never involved in an altercation. She also admitted that both she and Sheryl were alcoholics. Patricia testified that she was convicted of "several DUIs" and "[f]elony fleeing and almost running down a park ranger at the fireworks"; she had been drinking when she was arrested for these crimes. As to the events that occurred on June 8, 2002, Patricia explained that she went into the bathroom because Appellant was intimidating her and that she "tend[s] to hide when [she] feel[s] intimidated." Because she was in the bathroom when the argument between Sheryl and Appellant escalated into a physical altercation, she stated that she could not testify as to which person was the initial aggressor: Appellant or Sheryl Manthe.
 {¶ 17} Sheryl Manthe also testified about the events that took place on June 8, 2002. Sheryl explained that on June 8, 2002, she and Patricia indulged in "[t]he normal girlfriend things, laundry, cleaning house, playing cards, playing dice." The women also drank throughout the day. Sheryl testified that from 9:00 a.m. until approximately 7:30 p.m. she "drank about twelve or thirteen [beers], and [Patricia] drank about five." The women, Sheryl indicated, were "averaging a beer an hour." Despite drinking throughout the day, Sheryl stated that neither she nor Patricia were drunk when Appellant arrived at the apartment. She did admit, as did Patricia, that they were both alcoholics. Sheryl described herself as a "happy drunk" and that when Patricia drinks "[s]he is usually just quiet and sits around." Sheryl believed, as did Patricia, that Appellant was drunk when he arrived at Patricia's apartment.
 {¶ 18} Sheryl testified that when Appellant initially arrived at the apartment, "it was all right. [Appellant] sat down besides [sic] me, and Patricia said, better move because if your boyfriend comes he is not going to like it. And so I moved. And he moved over by me again. Then he tried to say how pretty I was, this and that, and it started getting rude." Sheryl stated that Appellant began to call her and Patricia "filthy names" and "he said, he bet he could take both us back in the bedroom and fuck us both at the same time." Because of Appellant's rude comments, the women repeatedly asked him to leave the apartment, but he refused to leave. Sheryl testified that Patricia became upset and left the room. Sheryl stated that after Patricia left the room, she told Appellant: "You are going to have to leave" and Appellant responded: "Have you been hit with bat before? I guess I'm fixing to." Appellant then "repeatedly [beat] [Sheryl] with the bat." When Appellant hit Sheryl with the bat she "went down on the ground" and then:
"[Appellant] started beating on [her]. From then Patricia come out and tossed him, said: Get off my girlfriend. And she threw [Sheryl] a chair. And then the rest of the bangs, you know, [Sheryl] had blocked it with the chair so he couldn't get [her] anymore. And [Sheryl] was screaming bloody murder.
"So finally [Patricia and Sheryl] made it into [Patricia's] bedroom and trying to call 911, but the neighbor already done it because when [the women] came out of the bedroom, there was [sic] police officers all over."
 {¶ 19} Sheryl testified that she never picked up the bat nor did she hit Appellant with it. Rather, she stated that Appellant was responsible for removing the bat from behind the couch and that he was the only person to use it. Sheryl explained that after the police arrived she was taken to the hospital by the paramedics. As a result of the attack, Sheryl stated that she suffered a "[f]ractured elbow, bruised ribs. My liver was damaged. I'm going to have my gallbladder taken out. Just — well, I couldn't walk for a month." She testified that she also suffered head injuries, which did not require stitches because "[t]hey couldn't stitch it up because it was zigzagged from the baseball bat, so they kind of butterflied it and put a Band-Aid on."
 {¶ 20} Karl Burton and James Donahue, police officers with the Akron Police Department, and Frank Poletta, a City of Akron paramedic, also presented testimony regarding the events that took place on June 8, 2002.
 {¶ 21} Officer Karl Burton testified that he received a 9-1-1 call from a dispatcher to respond to an "unknown 911 problem" on 811 East Wilbeth. Upon arriving at East Wilbeth, the officer "notice[d] [Appellant], he was walking away from the scene. * * * He was entering the south front part of the apartment complex, all grass there. As I was starting to — as I was coming in, his back was towards the cruiser. As I came in, he starts walking away. So I see behind him he was carrying a bat in his left hand." Officer Burton and Officer Donohue handcuffed Appellant and he was later identified by Patricia and Sheryl as their attacker. Appellant was then placed in a police "wagon[,]" treated for a cut on the bridge of his nose, and placed under arrest.
After Appellant was Mirandized, he told Officer Burton that:
"[H]e had come over to the apartment around 8:00 p.m. that night, he knows [Patricia] prior for a few years, also [Sheryl] was on scene, he is not familiar with her. He said he did know who [Sheryl] was at the time. They sat in the apartment at little while talking and drinking beer together.
"Then he indicated that [Sheryl] became upset, that he should leave.
"* * *
"He got up to leave, walking away, and she went to get the bat that she kept in the apartment, and that she hit him with the bat. * * * He just generally said he was hit in the face, the shoulders, the back, the arms.
"* * *
"[Appellant] [s]aid he was able to take the bat away from [Sheryl]. [Patricia] got him, by pushing him out the front door, that's when he left the scene and encountered us." P248-49.
 {¶ 22} Appellant also indicated to Officer Burton that he did not hit the two women. The officer stated that he did not believe Appellant's version of what occurred because it was inconsistent with the injuries Patricia and Sheryl sustained. The officer further stated that although Appellant did not smell like alcohol, he believed Appellant was intoxicated.
 {¶ 23} Office Burton's partner, Officer Donohue, also presented testimony that corroborated Patricia's and Sheryl's testimony. Officer Donohue explained that when he entered Patricia's apartment, he found empty beer cans, blood in the kitchen, and blood smeared across the bed and the telephone located in Patricia's bedroom. The officer testified that after Appellant was arrested, he saw:
"[T]wo females, which I learned later were Patricia Bentz and Sheryl Manthe. These females had significant head wounds.
"I say significant because there was a lot of blood coming from their injuries. Their clothing was covered with blood. There was blood on the floor in the kitchen. There was blood on the bedding in the bedroom. There was an overturned chair in the living room. It was obvious there had been a fight or some kind of incident in that apartment."
 {¶ 24} Officer Donohue personally questioned Patricia and Sheryl. He stated that the two women appeared to be under the influence of alcohol and that they were visibly upset. The officer testified that both women indicated that Appellant had assaulted them with a baseball bat. Sheryl told Officer Donohue that:
"[Appellant] became abusive, using abusive language to her, making lewd comments to her, and they asked him to leave. He refused to leave, grabbed a baseball bat. * * * [H]e grabbed a baseball bat behind the door or behind the couch, just off the living room and kitchen. * * * [Appellant] began to hit her about the head and body. * * * [Sheryl] fell, hit the ground, and he kept hitting, she lost track after 16 times how many times she was hit. [Patricia] came out of the bedroom, where she attempted to get [Appellant] off [Sheryl]. Patricia threw a chair at him and pushed him. According to her, he fell into the refrigerator and received an injury to his nose, went into the bedroom to make a phone call."
 {¶ 25} Officer Donohue also testified to the statements Appellant made while under arrest. Appellant told Officer Donohue that:
"[He] had been inside the apartment, that he had been drinking with the victims, that he was attacked by them. He grabbed the baseball bat, he denied completely that he ever assaulted them with a baseball bat, and that when we stopped him he was just leaving the apartment.
"I asked him `even, if you didn't assault them whether they were inside who did?' And he gave no explanation for how that could have happened, how these people could have gotten injured."
 {¶ 26} On cross-examination, Officer Donohue stated that the bat which Appellant used to assault Patricia and Sheryl was not tested for blood or dusted for fingerprints. Because the bat was not tested to determine if there was blood on it and the origin of the blood, defense counsel asked Officer Donohue: "My last question for you, Officer Donohue, the fact that that information is not presented or available to this jury, doesn't it make the ladies' story somewhat doubtful? Doesn't that cast some doubt in this case?" Officer Donohue responded: "In my mind, no." Officer Donohue explained that he did not believe that a blood test and fingerprint analysis were crucial to the investigation, especially in light of the victims' and Appellant's contradictory statements to the police.
 {¶ 27} Frank Poletta testified that when he and his partner arrived at 811 East Wilbeth, he found Patricia and Sheryl with "blood on their face [sic.]" Mr. Poletta stated that the women told him that "someone hit them with a baseball bat several times." After inspecting the women's bodies for injuries, the paramedics "found various bruises and big bumps called hematomas on their heads." Mr. Poletta further explained that "[the injuries Patricia and Sheryl received] were consistent with something being hit on the head with them. I didn't see — they stated that they got hit with a baseball bat. I never saw the baseball bat, but it was consistent with something that they were hit with. They both were — had various lacerations or cuts on their heads, bruises on their body." Mr. Poletta described the women as "very shook up, * * *. They were fearful. They were mad. There was [sic] a lot of emotions." The hospital reports generated as a result Sheryl's visit to Barberton Hospital also supported her testimony that she was beaten with a bat. Mr. Poletta read the medical reports aloud and according to the reports, Sheryl's "chief complaint" was "multiple injuries secondary to alleged assault." The reports also indicated that Sheryl informed the medical staff at Barberton Hospital that "she was at a girlfriend's house when an individual that was unknown to her from there at the house hit her multiple times with a baseball bat."
 {¶ 28} Mr. Poletta also provided medical attention to Appellant. The paramedic described the cut on the bridge of Appellant's nose as "very minor" and a Band-Aid was placed on the cut.
 {¶ 29} Despite the testimony elicited from Patricia Bentz, Sheryl Manthe, Officer Donohue, Officer Burton, and Frank Poletta, which indicated that Appellant was the initial aggressor and that he beat both Sheryl and Patricia with a bat owned by Patricia, Appellant presented a different version of events.
 {¶ 30} Appellant was the only witness to testify in his defense. On direct examination, he admitted that he was an alcoholic and that he suffered from an anxiety disorder and major depression. Appellant also admitted that he had previously been convicted of aggravated assault. With regard to his relationship with Patricia, he explained that they were "good friends[.]" He stated that he never displayed any aggression towards Patricia and that he had never displayed physical violence or aggression towards any female.
 {¶ 31} Appellant explained that on June 8, 2002, he started drinking beer around noon. Prior to arriving at Patricia's apartment, Appellant drank "about eight beers and * * * three double shots of Jack Daniel's Whiskey" at a nearby bar. When he arrived at Patricia's apartment, he brought a 12-pack of beer. After drinking the beers he brought to Patricia's apartment, he had a "good buzz[,]" but he was "not drunk to where [he] was falling down or anything like that." Appellant explained, however, that an average non-alcoholic man of his approximate weight and height would not be able to "handle" the amount of alcohol he consumed that night and would be rendered unconscious.
 {¶ 32} Unlike the victim's testimony, Appellant testified that the women called him names, and he "said some things back." He testified that he was never asked to leave and that Sheryl became violent when Appellant asked Patricia how she received her injuries (i.e., road rash and a black eye). He said that Patricia told him that:
"[H]er boyfriend, some man named Jay, did that to her. And so she was sitting there and she was beat up, and I said: Patty, I said, every time I see you, you have black eyes or beat up, you are still letting this guy beat you up? And she said: I asked him to leave a couple weeks ago and I have not seen him since. She told me that's why Sheryl was there, was to help protect her in case he came back. And Sheryl told me it was none of my blanking business.
"* * *
"I said: If Patty wants to tell me it is none of my business, let her tell me that. So me and Sheryl got into an argument. She said: Fuck you. I said: No, fuck you, too. You know, whatever. And she stood up and I stood up. We was arguing in each other's faces.
"Patty came out the bathroom and she pushed me up against the wall, in between the wall and table. When I turned around, that is when Sheryl hit my face with the baseball bat. She hit me between the eyes with it and also hit me in my shoulder."
 {¶ 33} Appellant admitted that he initially told the arresting police officers that he did not know how the women received their injuries, but on direct examination Appellant stated:
"I know for a fact that I didn't hit Patty with [the bat]. And I'm not — you know, I'm not saying that I'm a[n] angel and maybe — I'm saying maybe I did hit Sheryl, but I don't remember — if I said I did, I would be lying. As far as I know, I didn't. I mean, that's why — I would be willing to take a lie detector test."
 {¶ 34} The reason Appellant initially lied to the police, was "[b]ecause [he] was scared. [He] was nervous. [He] didn't want to say what [he] did right then."
 {¶ 35} Despite his statement that he did not remember hitting Sheryl with that bat, Appellant indicated that he was attempting to defend himself when he took the bat from Sheryl. He further explained that he only used enough force to defend himself. Appellant intimated that if his intent was to seriously harm Sheryl, as opposed to using only enough force to defend himself, he could have "cracked her skull and [possibly] killed her."
 {¶ 36} On cross-examination, Appellant stated that he was not drunk on the night of June 8, 2002, and that he had a "clear memory of everything [that] happened that night." He denied making any "crude, lewd comments" about the two women or "call[ing] them vulgar names, derogatory names, female anatomy[.]" He again denied hitting the women. The following colloquy took place when the state, while introducing pictures of the bruised victims, asked Appellant to explain the women's injuries.
"[The state]: My next question, sir, is to ask: State's Exhibit Number 13, do you recognize that lady?
"[Appellant]: Yes, I do.
"[The state]: That's your best friend of — good friend of five years, correct?"
"[Appellant]: Yes.
"[The state]: That's Patricia Bentz?
"[Appellant]: Yes.
"[The state]: And what does that picture portray?
"[Appellant]: She has a bloody head.
"[The state]: And she's where?
"[Appellant]: She looks like she is in the hospital.
"[The state]: And you didn't strike her, did you?
"[Appellant]: No. I don't think I did.
"* * *
"[The state]: How about State's Exhibit Number 19, who is that lady?
"[Appellant]: That's Sheryl Manthe
"[The state]: That's your attacker, is it?
"[Appellant]: That's the girl that hit me with the bat, yes.
"[The state]: What does the picture portray?
"[Appellant]: Her in the hospital.
"[The state]: Does it show any injury?
"[Appellant]: Looks like she has a lump on her head.
"[The state]: You did not hit her with a bat, did you, sir?
"[Appellant]: It is possible."
 {¶ 37} It is apparent from the testimony presented at trial that Appellant was unsure of whether he actually hit Patricia or Sheryl. He first testified that he could not remember hitting the women. Then he later states that he is certain that he did not hit Patricia and that if he did hit Sheryl, it was only in self-defense.
 {¶ 38} The jury had to choose between the victim's version of events (i.e., Appellant was the unprovoked attacker) and the attacker's version of events (i.e., Appellant was acting in self-defense). In situations where there are two competing version of events, the jury must decide which witnesses are telling the truth and the credibility of the witnesses is for the jury to decide. "Credibility is a question of fact to be determined by the jury and a reviewing court should not substitute its judgment for that of the jury." State v. Walker (1978),55 Ohio St.2d 208, 212, certiorari denied (1979), 441 U.S. 924,99 S.Ct. 2033, 60 L.Ed.2d 397. The jury is in the best position to view the witnesses' testimony and adjudge their credibility. This Court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless we conclude that the factfinder clearly lost its way. State v. Urbaytis (1951), 156 Ohio St. 271, 278. Moreover, "[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4.
 {¶ 39} After reviewing the testimony presented at trial, however, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it convicted Appellant of one count of felonious assault. Appellant essentially admitted that he hit Sheryl and, based upon that testimony and the evidence which indicated Appellant was the initial aggressor, a reasonable jury could conclude that Appellant "knowingly" hit Sheryl and that he was not acting in self-defense when he did so. Furthermore, the testimony presented by Sheryl and Frank Poletta indicated that Sheryl suffered serious physical harm that caused acute pain and left her incapacitated for a brief period of time.
 {¶ 40} As to Appellant's claim that there was insufficient evidence for a jury to find him guilty, we note that this Court has previously held that a "defendant who is tried before a jury and brings a Crim.R 29(A) motion for acquittal at the close of the state's case waives any error in the denial of the motion if the defendant puts on a defense and fails to renew the motion for acquittal at the close of all the evidence." State v. Jaynes, 9th Dist. No. 20937, 2002-Ohio-4527, at ¶ 7, quoting State v. Miley (1996), 114 Ohio App.3d 738, 742.
 {¶ 41} At the close of the state's evidence, Appellant made a Crim.R. 29 motion and the trial court denied the motion. The journal entry reflects that Appellant renewed his Crim.R. 29 motion and that said motion was denied. Thus, Appellant has properly preserved his right to appeal the trial court's denial of his Crim. R. 29 motion. However, we need not consider Appellant's assertion that there was insufficient evidence to prove that Appellant caused Sheryl serious physical harm or that Sheryl suffered serious physical harm because this Court has previously observed that "because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006432, at 4. As we have already determined that Appellant's conviction was not against the manifest weight of the evidence, we must necessarily conclude that there was sufficient evidence to support the verdict in this case. Accordingly, Appellant's first, second, and third assignments of error are not well taken.
 III
Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
CARR, P.J., and BATCHELDER, J. CONCUR.